UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

VILMA NOKAJ,

                           Plaintiff,

              v.

NORTH EAST DENTAL MANAGEMENT,
LLC, formerly known as GARDEN STATE
DENTAL MANAGEMENT, LLC, d/b/a
FAMILY DENTAL GROUP; DR.
MICHAEL GELBART; DR. FRED
FRIEDMAN; DR. LAWRENCE STEIN;
VICTORIA WICKE; CAROLYN
TOTILLO; JUSTINE ANTONATOS;
MARIA FARIDES,

                           Defendants.

No. 16-CV-3035 (KMK)

<u>OPINION & ORDER</u>

<u>Appearances:</u>

Denise M. Cossu, Esq.
Gaines, Novick, Ponzini, Cossu & Venditti, LLP
1133 Westchester Avenue
White Plains, NY
*Counsel for Plaintiff*

James William Weller, Esq.
Juan Luis Garcia, Esq.
Michal Ettie Ovadia, Esq.
Zackary Lane Stillings, Esq.
Nixon Peabody LLP
Jericho, NY and New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, District Judge:

        Plaintiff Vilma Nokaj ("Plaintiff") brings this Action against Defendants North East

Dental Management, LLC, formerly known as Garden State Dental Management, LLC, and

doing business as Family Dental Group ("NEDM"), Dr. Michael Gelbart ("Gelbart"), Dr. Fred

Friedman ("Friedman"), Dr. Lawrence Stein ("Stein"), Victoria Wicke ("Wicke"), Carolyn

Totillo ("Totillo"), Justine Antonatos ("Antonatos"), and Maria Farides ("Farides") (collectively,

"Defendants"), alleging that Defendants engaged in discrimination and retaliation against her in

violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq.* ("Title VII"),

and the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.* ("NYSHRL"). (*See*

2d Am. Compl. (Dkt. No. 63).) Plaintiff also asserts malicious prosecution claims against

Defendants NEDM, Gelbart, Totillo, and Farides. (*See id.*)[1]

 Before the Court is Defendants' Motion for Partial Summary Judgment ("Motion") on (1)

Plaintiff's claim under NYSHRL § 296(6) against Defendant Antonatos; (2) Plaintiff's claim

under NYSHRL § 296(1) against Defendant Stein; (3) Plaintiff's claims for malicious

prosecution against Defendants NEDM, Gelbart, Totillo, and Farides; and (4) Plaintiff's claim

for lost wages. (*See* Defs.' Not. of Mot. (Dkt. No. 82).)[2] For the reasons to follow, the Motion is

denied.

---

[1] Plaintiff voluntarily withdrew her malicious prosecution claims against Defendants
Friedman, Stein, Wicke, and Antonatos. (*See* Pl.'s Mem. Of Law in Opp'n to Mot. for Summ. J.
("Pl.'s Mem.") 8 n.4 (Dkt. No. 99).)

[2] Plaintiff voluntarily withdrew her claims against Antonatos under NYSHRL §§ 296(1)
and (7), and her claims against Stein under NYSHRL §§ 296(6) and (7). (*See* Pl.'s Mem. 2 n.1,
5 n.3.)

## I.  Background

### A.  Factual Background

In resolving Defendants' Motion, the Court will recite only either undisputed facts or those set forth by Plaintiff and supported by the record.  The Court will not, except as noted, set forth Defendant's version of the facts where disputed.

#### 1.  Plaintiff's Employment with NEDM

On or about May 25, 2010, Plaintiff was hired as a part-time receptionist at the Jefferson Valley office of Family Dental Group ("Family Dental"), a dental practice with multiple locations.  (Defs.' Mem. of Law in Supp. of Summ. J. ("Defs.' Mem.") Ex. 1 (Defs.' Local Rule 56.1 Statement of Material Facts) ("Defs.' 56.1") ¶ 25 (Dkt. No. 92); Pl.'s Resp. to Defs.' Rule 56.1 Statement ("Pl.'s 56.1 Resp.") ¶ 25 (Dkt. No. 97).)[3]  NEDM and its employees rely on the dentists practicing at Family Dental for information and instructions relating to, among other things, procedures and treatments for patients, patient billing and collections, and authorization for patient account adjustments or discounts.  (Defs.' 56.1 ¶ 4.)  Plaintiff's employer while she worked at Family Dental was NEDM.  (*Id.* ¶¶ 26, 27, 31.)  Plaintiff earned $16.50 per hour, with total earnings of $14,374.00 for the tax year ending December 2010.  (*Id.* ¶¶ 26, 28.)  In October

---

[3] The relationship between NEDM, Gelbart and Kesselman PC, and Family Dental is disputed, although the Parties agree that Gelbart and Kesselman PC operates as Family Dental. (Pl.'s 56.1 Resp. ¶ 1.)  Plaintiff alleges that NEDM acquired Family Dental in or about 2007 and owns 80% of the company, while Defendants deny that NEDM "is a parent, subsidiary, or affiliate, directly or indirectly, of Family Dental" and maintain that NEDM "solely provides administrative services, staff, and equipment to Gelbart and Kesselman Dentistry, P.C., doing business as Family Dental Group."  (*Id*; Pl.'s Decl. in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Decl.") Ex. 1 ("NEDM Handbook"), at 5–6 (Dkt. No. 96); Pl.'s Decl. Ex. 2 (June 9, 2017 Deposition of Michael Gelbart) ("Gelbart Dep."), at 16.)

2011, Plaintiff received a $1.00 per hour raise, and earned a total of $31,024.94 for the tax year ending December 2011. (*Id.* ¶¶ 29–30.)

Defendant Stein worked with Plaintiff in the Jefferson Valley office of Family Dental from May 2010 until March 2012. (*Id.* ¶ 32.) All alleged instances of sexual harassment relevant to this Action that are ascribed to Defendant Stein occurred while Plaintiff was employed in the Jefferson Valley Office. (*Id.* ¶ 33.)[4] It is undisputed that the latest date upon which any conduct supporting a claim against Stein under the NYSHRL occurred is December 2, 2011. (Defs.' Mem. 7; Pl.'s Mem. in Opp'n to Mot. for Summ. J. ("Pl.'s Mem.") 5 (Dkt. No. 99).)

In March 2012, Plaintiff moved to the Brewster location of Family Dental and began working as a "front desk manager and finance person." (Defs.' 56.1 ¶ 38.) At the Brewster office, Plaintiff reported directly to the Office Manager, Defendant Antonatos, and NEDM's Regional Manager, Defendant Totillo. (Defs.' 56.1 ¶ 39.) Antonatos reported directly to Totillo and NEDM's Chief Operating Officer, Defendant Wicke. (Defs.' 56.1 ¶ 49.) In June 2012, Plaintiff received a pay raise from $17.50 per hour to $20.00 per hour, and in September 2012 she was promoted to Assistant Office Manager of the Brewster location and her pay was raised once again to $25.00 per hour. (Defs.' 56.1 ¶¶ 41, 44; Pl.'s 56.1 Resp. ¶¶ 41, 44.)[5] In November 2012, as a salaried employee of NEDM, Plaintiff received a pay raise to $57,000.00 per year, and

---

[4] The facts surrounding allegations of sexual harassment against Defendant Stein are disputed. However, for purposes of deciding this Motion, only the timing of the alleged conduct is relevant.

[5] Plaintiff does not dispute that her salary was raised to $25.00 per hour, but disputes Defendants' assertion that she earned $52,000.00 per year, noting that her "yearly compensation depended upon the numbers of hours worked as well as bonuses earned." (Pl.'s 56.1 Resp. ¶ 44.)

she earned a total of $46,126.70 for the tax year ending December 2012.  (Defs.' 56.1 ¶¶ 53, 54.)

In September 2013, Plaintiff received another pay raise, to $62,000.00 per year, and earned a

total of $59,846.23 for the tax year ending December 2013.  (Defs.' 56.1 ¶¶ 55, 56.)

      As Assistant Office Manager, Plaintiff continued to report directly to Antonatos and

Totillo.  (Defs.' 56.1 ¶ 45.)  However, Antonatos did not have the independent authority or

discretion to hire, fire, transfer, set or alter the rate of pay, or set or alter the schedule of Plaintiff.

(Defs.' 56.1 ¶ 46; Pl.'s 56.1 Resp. ¶ 46.)[6]  Antonatos had the ability to make recommendations

regarding Plaintiff's employment, but could not substitute her supervisor's discretion for her own

in making NEDM personnel decisions.  (Defs. 56.1 ¶¶ 47, 48; Decl. of Justine Antonatos

("Antonatos Decl.") ¶ 8 (Dkt. No. 87); Pl.'s 56.1 Resp. ¶¶ 47, 48.)

### 2.  Plaintiff's Sexual Harassment Allegations

      Plaintiff alleges that at the Brewster office, Defendant Gelbart would discuss his personal

sexual interests and encounters with various women, including some of his employees at Family

Dental.  (Pl.'s Counter. to Defs.' Rule 56.1 Statement of Material Facts ("Pl.'s Counter.") ¶¶ 69,

70; Defs.' Reply Decl. in Further Supp. of Mot. for Summ. J. ("Defs.' Reply Decl.") (Dkt. No.

100) Ex. 1 (June 1, 2017 Deposition of Vilma Nokaj) ("Nokaj Dep."), at 111–112, 114–115;

Pl.'s Decl. Ex. 9 (Decl. of Vilma Nokaj) ("Nokaj Decl.") ¶¶ 11, 14.)  On one occasion, Gelbart

recounted, in the presence of Plaintiff and Antonatos, a story in which he claims to have had anal

sex with a Family Dental employee, and then subsequently returned home and had sex with his

wife the same day.  (Pl.'s Counter. ¶¶ 75–76; Nokaj Dep. 114–116; Antonatos Dep. 36–37.)

---

[6] Plaintiff disputes Defendant's assertion that Antonatos also lacked the authority to "otherwise affect the terms of Plaintiff's employment."  (Pl.'s 56.1 Resp. ¶ 46.)

Afterward, Plaintiff expressed her discomfort with the conversation to Antonatos, but Antonatos did not report Gelbart's comments to Human Resources, an omission that she conceded potentially violated the office's sexual harassment policy.  (Pl.'s Counter. ¶¶ 77–78; Nokaj Dep. 116–117; Antonatos Dep. 39, 57–58, 124, 125–126, 135–136; Pl.'s Decl. Ex. 10 ("Office Policy on Sexual Harassment").)  On another occasion on February 1, 2014, Gelbart grabbed his genitals through his scrubs and placed them on Plaintiff's desk in her and Antonatos's presence, stating, "[t]hey just want to sit and relax on your desk."  (Pl.'s Counter. ¶ 84; Nokaj Dep. 292–293; Antonatos Dep. 133–135.)  Antonatos did not report the incident.  (Antonatos Dep. 135.) Plaintiff complained to Antonatos and Totillo about these and other instances of alleged sexual harassment by Gelbart, but his behavior did not change.  (Pl.'s Counter. ¶ 104; Nokaj Dep. 283.) It is undisputed that Antonatos never personally sexually harassed Plaintiff.  (Defs.' 56.1 ¶ 51.)

### 3.  Adjustments to Patient Billing Accounts

In May 2014, Plaintiff was re-assigned to the position of Regional Collections Manager in the Brewster office of Family Dental.  (Defs.' 56.1 ¶ 57; Nokaj. Dep. 45.)  Defendants Stein, Friedman, and Antonatos neither recommended, nor were present for, consulted, or otherwise involved in the decision to change Plaintiff's role from Assistant Office Manager to Regional Collections Manager.  (Defs.' 56.1 ¶¶ 61, 63, 64.)  That same month, Defendant Farides became Office Manager of the Brewster office, and upon her arrival Plaintiff no longer reported to Antonatos, but continued to report directly to Totillo.  (Defs.' 56.1 ¶¶ 58–60.)

At Family Dental, dentists had the authority to approve downward adjustments to bills for their dental services.  (Defs.' 56.1 ¶ 72; Pl.'s 56.1 Resp. ¶ 72; Gelbart Dep. 122–123, 138; Pl.'s

Decl. Ex. 4 (June 13, 2017 Deposition of Carolyn Totillo) ("Totillo Dep.") 88–89.)[7] Although there was no written policy in place regarding family discounts, (Pl.'s Counter. ¶ 134; Totillo Dep. 89), Gelbart often discounted services provided to family members of employees, (Pl.'s Counter. ¶ 129; Gelbart Dep. 122–123, 134–136; Totillo Dep. 88–89). As part of her employment at NEDM, Plaintiff signed an agreement stating that she would not make unauthorized modifications or purges of patient information from Family Dental's computer systems. (Defs.' 56.1 ¶ 27.)

During her time in the Brewster office, Plaintiff made several downward adjustments to charges for services rendered to her family members by Family Dental; Plaintiff asserts, and Defendants dispute, that all adjustments were authorized or covered by insurance, or, in some cases, that documentation provided by Defendants purporting to show unauthorized adjustments were in fact fraudulently doctored. (*See* Defs.' 56.1 ¶¶ 74, 77, 79, 81; Pl.'s 56.1 Resp. ¶¶ 74, 77, 79, 81; Nokaj Dep. 228–229, 233–237, 239–255, 257–261; *see also* Pl.'s Counter. ¶¶ 236–320.) On August 26, 2014, Farides emailed Totillo and Defendant Wicke and wrote that Plaintiff had made unauthorized adjustments to the patient ledgers for members of her family. (*See* Defs.' Decl. in Supp. of Mot. for Summ. J. ("Defs.' Decl.") Ex. 38 ("Farides Email").)[8] NEDM retained Steven Landy ("Landy"), an attorney, to advise regarding the adjustments; Plaintiff asserts that Landy was hired in bad faith as part of a "scheme" to retaliate against her for her

---

[7] Plaintiff also asserts that Gelbart had the authority to make downward adjustments for dental services provided to any patient of the dental practice. (*See* Pl.'s 56.1 Resp. ¶ 72; Pl.'s Counter. ¶¶ 125–127.)

[8] The Parties dispute how these adjustments came to Farides's attention and whether they were in fact first observed in August 2014. (Pl.'s 56.1 Resp. ¶¶ 65, 66, 75, 76.)

sexual harassment complaints, while Defendants assert that he was hired to advise on how to address the allegedly unauthorized adjustments. (Defs.' 56.1 ¶¶ 84–88; Pl.'s 56.1 Resp. ¶¶ 84–88.)

On September 3, 2014, Plaintiff received a formal written warning which stated that she made unauthorized adjustments to multiple patients' accounts. (Defs.' 56.1 ¶ 94; Pl.'s 56.1 Resp. ¶ 94; Defs.' Decl. Ex. 39 ("Corrective Action Notice"); Defs.' Decl. Ex. 40 ("Totillo Email").) After Plaintiff was issued the formal written warning, she stated that Gelbart had "touched" her. (Defs.' 56.1 ¶ 99; Pl.'s 56.1 Resp. ¶ 99.) [9] Totillo reported Plaintiff's statement to NEDM Human Resources Director Larry Turner. (Defs.' 56.1 ¶ 100; *see also* Totillo Email.) On September 4, 2014, Plaintiff's employment with NEDM was terminated. (Defs.' 56.1 ¶ 103.) Defendants Stein and Antonatos neither recommended, nor were present for, consulted, or otherwise involved in the decision to terminate Plaintiff's employment. (*Id.* ¶¶ 104, 105.) Plaintiff earned $45,365.48 through her employment with NEDM for the tax year ending December 2014. (*Id.* ¶ 106.)

### 4. Initiation of Police Investigations

The same day as Plaintiff's termination, Police Trooper Nicholas Guido ("Guido") was called to the Brewster office of Family Dental, where he took statements from Totillo, Eschner, Farides, and Family Dental employee Rebecca Tannen ("Tannen"). (Defs.' Decl. Ex. 47

---

[9] Defendants also state that when asked to explain Plaintiff's allegation that Gelbart "touched" her, Plaintiff responded, "never mind." (*See* Defs.' 56.1 ¶ 99.) Plaintiff disputes this assertion. (*See* Pl.'s 56.1 Resp. ¶ 99.)

("Guido Incident Report"), at N00566.)[10]  Guido's report indicates that the employee statements reported that Plaintiff "caused a scene" after being terminated, and noted he was told that Family Dental had required Plaintiff to sign a written warning for "various account adjustments" and that immediately afterward Plaintiff had "accused members of the staff of sexually abusing her." (*Id.*)  The report also noted, "[the] [c]omplainants do not wish to press charges at this time." (*Id.*)  On September 22, 2014, Totillo gave a statement to Guido indicating that she witnessed Plaintiff say to her upon her termination, "You sure you want to do this?  You will be sorry," but affirming that "[o]n behalf of the manager, and Family Dental Group, we as a company, do not wish to press charges at this time."  (*Id.* at N00566, N00568; Defs.' Decl. Ex. 52 ("Totillo Statement"), at N00572.)  Guido closed the case that day.  (Guido Incident Report N00568.)

Guido's report also stated that Investigator Peter Ciacci ("Ciacci") would handle the sexual harassment allegations in a separate case.  (*See id.* at N00566.)  The day of Plaintiff's discharge she went to the New York State Police, where she met with and was interviewed by Ciacci and filed a formal complaint of criminal sexual harassment.  (Defs.' Decl. Ex. 53 ("Ciacci Incident Report"), at N00678.)  On September 11, 2014, and again on September 15, 2014, Ciacci interviewed Antoinette Thomas ("Thomas"), a former employee of Family Dental, who told Ciacci that she had also been a victim of unwanted sexual contact by Gelbart, and that she had reported such conduct to the Yorktown Police Department and filed a civil case against him. (*Id.* at N00679–80.)  On October 1, 2014, Ciacci interviewed Farides, Tannen, and Eschner regarding Plaintiff's sexual harassment allegations.  (Defs.' 56.1 ¶ 121; Ciacci Incident Report

---

[10] Where non-paginated exhibits are filed under seal and therefore do not have ECF-generated page numbers, the Court will cite to the stamped bates number at the bottom right corner of the relevant page.

N00681–82.)  On February 18, 2015, Antonatos, Friedman, Gelbart, Totillo, Farides and Wicke were interviewed by Ciacci regarding Plaintiff's sexual harassment allegations.  (Defs.' 56.1 ¶¶ 122, 124, 127; Ciacci Incident Report N00683.)  On February 21, 2015, Ciacci indicated in his notes that he had contacted Plaintiff and informed her that he was unable to develop witnesses to corroborate her claims regarding unwanted sexual contact, and closed the case.  (Ciacci Incident Report N00684.)[11]

On February 23, 2015, Landy informed the New York State Police that NEDM would like to press criminal charges against Plaintiff for the alleged unauthorized billing adjustments.  (Defs.' 56.1 ¶ 130; Pl.'s 56.1 Resp. ¶ 130.)  Police Investigator Chaderick Greer ("Greer") investigated the charges, including conducting interviews with Totillo, Farides, and Landy and receiving statements from Tannen and Eschner.  (*See* Defs.' 56.1 ¶ 133; Pl.'s 56.1 Resp. ¶ 133; Defs.' Decl. Ex. 54 ("Greer Incident Report").)  On June 9, 2015, Plaintiff was arrested and charged with Falsifying Business Records in the First Degree, Felony Grand Larceny in the Third Degree, and Misdemeanor Forgery in the Third Degree.  (Defs.' 56.1 ¶¶ 142, 143; Pl.'s 56.1 Resp. ¶ 142, 143; Defs.' Decl. Ex. 57 ("Arrest Report"), at N00592–93.)  On January 28, 2016, all criminal charges against Plaintiff were withdrawn with prejudice and the file sealed.  (Defs.' 56.1 ¶ 144; Pl.'s 56.1 Resp. ¶ 144; Defs.' Decl. Ex. 59 ("Certificate of Disposition"), at N00190.)  Assistant District Attorney Andres D. Gil ("Gil"), who was assigned to prosecute the

---

[11] Plaintiff disputes Ciacci's conclusion that no witness corroborated her allegations, noting that (1) Thomas stated that she had witnessed Gelbart "touch[] the underside of [Plaintiff's] breasts while making a comment that Thomas was unable to hear," and that Plaintiff had told her at that time that she "did not want to say anything because she was afraid of being fired"; and (2) Farides stated that she observed Friedman reach out and grab a necklace that Plaintiff was wearing and pull it towards him, and that Plaintiff backed away and said, "Don't touch me."  (Pl.'s 56.1 Resp. ¶ 129; Ciacci Incident Report N00680–81.)

charges against Plaintiff, determined that "the District Attorney's Office did not have a good faith basis to proceed with the prosecution," noting that it was anomalous that Plaintiff did not receive free or discounted dental services for her family on the identified occasions as was customary at Family Dental, and that the timing of the resurrection of the charges following Plaintiff's filing of an EEOC complaint against NEDM undermined the sufficiency of the allegations. (*See* Pl.'s Decl. Ex. 36 (Decl. of Andres G. Gil) ("Gil Decl.") ¶¶ 3–6.)

### 5. Alternative Employment

After her termination, Plaintiff worked as an executive assistant to the Chief Executive Officer of Interstate Toyota ("Interstate") from September 2014 to January 2015, earning a salary of $65,000 per year. (Defs.' 56.1 ¶ 107.) For the tax year ending December 2014, Plaintiff earned $20,000 from her employment with Interstate. (Defs.' 56.1 ¶ 108.) Plaintiff left the position in January of 2015 because the commute from her home was approximately an hour and ten minutes in each direction, and the work hours combined with the commute interfered with her childcare responsibilities. (Pl.'s 56.1 Resp. ¶ 107.) Since leaving Interstate, Plaintiff has not obtained alternative employment. (Defs.' 56.1 ¶ 145.)

### B. Procedural History

On October 16, 2014, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against "Garden State Dental Management d/b/a Family Dental Group" for the conduct underlying this Action. (*See* 2d Am. Compl. Ex. A ("EEOC Charge")). On March 30, 2016, the EEOC mailed Plaintiff a "right-to-sue" letter. (*See* 2d Am. Compl. Ex. B ("Right-To-Sue Letter").) Plaintiff filed her original Complaint on April 25, 2016, (*see* Compl. (Dkt. No. 1)), and Defendants filed their Answer on June 27, 2016, (*see*

Answer (Dkt. No. 17)).  Plaintiff filed her First Amended Complaint on November 18, 2016.  (*See* 1st Am. Compl. (Dkt. No. 26).)

On March 3, 2017, Defendants filed a Motion To Dismiss.  (*See* Dkt. No. 36.)  Plaintiff filed her Opposition on April 7, 2017, (*see* Dkt. No. 39), and Defendants filed a Reply on April 28, 2017, (Reply Mem. of Law in Further Supp. of Mot. To Dismiss (*see* Dkt. 40)).  On November 15, 2017, the Court denied Defendants' Motion To Dismiss without prejudice, set a deadline for Plaintiff to file a Second Amended Complaint, and established a briefing schedule for Defendants' Motion for Summary Judgment.  (*See* Dkt. (minute entry for Nov. 15, 2017); Dkt. No. 61.)  On November 17, 2017, Plaintiff filed her Second Amended Complaint, (2d Am. Compl.), which Defendants answered on January 19, 2018, (Dkt. No. 67).

On April 20, 2018, Defendants filed the instant Motion.  (Defs.' Not. Of Mot.; Defs.' Mem.; Defs.' Decl.)  Plaintiff filed her Opposition on June 15, 2018, (Pl.'s Mem.; Pl.'s Decl.; Pl.'s 56.1 Resp.; Pl.'s Counter.), and Defendants filed their Reply on July 9, 2018, (Reply Mem. of Law in Further Supp. of Mot. for Summ. J. ("Defs.' Reply") (Dkt. No. 100); Defs.' Reply Decl.; Defs.' Resp. to Pl.'s Counter. (Dkt. No. 101)).

## II.  Discussion

### A.  Standard of Review

Summary judgment is appropriate where the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Psihoyos v. John Wiley & Sons, Inc.*, 748 F.3d 120, 123–24 (2d Cir. 2014) (same).  "In determining whether summary judgment is appropriate," a court must "construe the facts in the light most favorable to the non-moving party and . . . resolve all

ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks omitted); *see also Borough of Upper Saddle River v. Rockland Cty. Sewer Dist. No. 1*, 16 F. Supp. 3d 294, 314 (S.D.N.Y. 2014) (same). "It is the movant's burden to show that no genuine factual dispute exists." *Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004).

"However, when the burden of proof at trial would fall on the nonmoving party, it ordinarily is sufficient for the movant to point to a lack of evidence to go to the trier of fact on an essential element of the nonmovant's claim," in which case "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *CILP Assocs., L.P. v. Pricewaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (alteration, citation, and internal quotation marks omitted). Further, "[t]o survive a [summary judgment] motion . . . , [a nonmovant] need[s] to create more than a 'metaphysical' possibility that his allegations were correct; he need[s] to 'come forward with specific facts showing that there is a genuine issue for trial,'" *Wrobel v. County of Erie*, 692 F.3d 22, 30 (2d Cir. 2012) (emphasis omitted) (quoting *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), "and cannot rely on the mere allegations or denials contained in the pleadings," *Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 322 (S.D.N.Y. 2014) (internal quotation marks omitted); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) ("When a motion for summary judgment is properly supported by documents or other evidentiary materials, the party opposing summary judgment may not merely rest on the allegations or denials of his pleading . . . ."). And, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could

believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

"On a motion for summary judgment, a fact is material if it might affect the outcome of the suit under the governing law." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (internal quotation marks omitted). At this stage, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod*, 653 F.3d at 164 (internal quotation marks omitted). Thus, a court's goal should be "to isolate and dispose of factually unsupported claims." *Geneva Pharm. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 495 (2d Cir. 2004) (internal quotation marks omitted). However, a district court should consider "only evidence that would be admissible at trial." *Nora Beverages, Inc. v. Perrier Grp. of Am., Inc.*, 164 F.3d 736, 746 (2d Cir. 1998). "[W]here a party relies on affidavits or deposition testimony to establish facts, the statements 'must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.'" *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012) (quoting Fed. R. Civ. P. 56(c)(4)).

### B. Analysis

#### 1. Plaintiff's Claim Under NYSHRL § 296(6) Against Defendant Antonatos

Section 296 of the NYSHRL states that "[i]t shall be an unlawful discriminatory practice . . . [f]or an employer or licensing agency, because of an individual's . . . sex . . . to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a). Plaintiff asserts that Defendant Antonatos is liable under § 296(6),

14

which makes it "unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under [NYSHRL]." N.Y. Exec. Law § 296(6). Section 296(6) "has been construed by the Second Circuit to impose liability on an individual defendant who actually participates in the conduct giving rise to a discrimination claim." *Lewis v. Triborough Bridge & Tunnel Auth.*, 77 F. Supp. 2d 376, 380 (S.D.N.Y. 1999) (emphasis omitted) (quoting *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1317 (2d Cir. 1995), *abrogated on other grounds by Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998)); *see also Chamblee v. Harris & Harris, Inc.*, 154 F. Supp. 2d 670, 677 (S.D.N.Y. 2001) ("The Second Circuit Court of Appeals has held that, under section 296(6), employees who are not shown to have any power to do more than carry out personnel decisions made by others, but who actually participate in discriminatory conduct, can still be liable [under] the [NYSHRL]." (citing *Tomka*, 66 F.3d at 1317)). Under § 296(6), a co-worker who "actually participates" in the conduct giving rise to a claim can be liable "even though that co-worker lacked the authority to either hire or fire the plaintiff." *Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004) (citing *Tomka*, 66 F.3d at 1317). Furthermore, "[a] supervisor's failure to take adequate remedial measures in response to a complaint of discrimination has been deemed 'actual participation' under NYSHRL § 296(6)." *Parra v. City of White Plains*, 48 F. Supp. 3d 542, 555 (S.D.N.Y. 2014) (alteration, citation and internal quotation marks omitted); *see also Kellman v. Metro. Transp. Auth.*, 8 F. Supp. 3d 351, 393 (S.D.N.Y. 2014) ("Liability may extend to supervisors who failed to investigate or take appropriate remedial measures despite being informed about the existence of alleged discriminatory conduct." (internal quotation marks omitted)). "However, where the plaintiff fails to plead any facts suggesting that a defendant displayed any intent to discriminate or was in any

way involved in the alleged discriminatory scheme the defendant may not be held liable under the NYSHRL." *Aiola v. Malverne Union Free Sch. Dist.*, 115 F. Supp. 3d 321, 337 (E.D.N.Y. 2015) (internal quotation marks omitted).

Assuming arguendo that Plaintiff can sufficiently establish a primary violation of § 296, as required for aider and abettor liability to exist, *see White v. Pacifica Found.*, 973 F. Supp. 2d 363, 378 (S.D.N.Y. 2013) (noting that where a plaintiff "has not demonstrated a primary violation, there can be no liability for aiding and abetting" (internal quotation marks omitted)), Plaintiff has created a triable issue of fact with respect to Antonatos's liability under the statute. Plaintiff argues that because Antonatos, as one of her supervisors, witnessed alleged incidents of sexual harassment by Gelbart and failed to report them to human resources or upper management, she is liable for aiding and abetting the discrimination against Plaintiff. Defendants, citing *Kellman*, argue that Antonatos's awareness of Gelbart's alleged conduct does not amount to approval of discrimination under § 296(6). *See Kellman*, 8 F. Supp. 3d at 393 (granting summary judgment on some claims under § 296(6) in favor of two supervisor defendants who were "aware of and approved [the] discriminatory promotion and training decisions and . . . failed to address complaints of discrimination"). However, although the court in *Kellman* did grant summary judgment on some of the plaintiff's claims under § 296(6), it notably reserved judgment on the plaintiff's aiding-and-abetting claims "related to the creation and maintenance of a hostile work environment," which is among the primary violations alleged here. *Kellman*, 8 F. Supp. 3d at 394. (*See* 2d Am. Compl. ¶¶ 121–122.) Furthermore, many courts have denied summary judgment in cases where the defendant's participation consisted only of a failure to report or address discriminatory conduct of which he or she was aware. *See,*

*e.g.*, *Smith v. Town of Hempstead Dep't of Sanitation Sanitary Dist. No. 2*, 798 F. Supp. 2d 443, 456 (E.D.N.Y. 2011) (denying summary judgment where "the plaintiffs primarily point to a single piece of undisputed evidence allegedly showing" that a defendant "saw [the discriminatory act], and failed to report it to anyone or to take any remedial action"); *Pellegrini v. Sovereign Hotels, Inc.*, 740 F. Supp. 2d 344, 356 (N.D.N.Y. 2010) (denying summary judgment because supervisor "ignoring, writing off, discouraging, and failing to investigate Pellegrini's complaints could amount to acquiescence in and aiding and abetting of the creation of a hostile work environment"); *Wise v. New York City Police Dep't*, 928 F. Supp. 355, 374 (S.D.N.Y. 1996) (finding summary judgment "inappropriate because there are disputed issues of material fact concerning whether [one defendant] knew about the alleged hostile work environment in the Precinct and whether he condoned it, and whether [another defendant] observed [an alleged] incident and failed to intervene").

Here, construing all evidence in Plaintiff's favor, Antonatos witnessed two instances of Gelbart allegedly sexually harassing Plaintiff, and received an unspecified number of informal complaints from Plaintiff on the same subject. (*See* Antonatos Dep. 36–38; Nokaj Dep. 283–85.) Antonatos concedes that she did not report Gelbart's conduct to anyone more senior to her at Family Dental or to HR, and that this may have violated Family Dental's sexual harassment policy. (*See* Antonatos Dep. 39, 57–58, 124, 125–126, 135–136; Nokaj Dep. 116–117.) It is for a jury, and not this Court, to weigh the proffered testimony and determine whether the conduct rises to the level of aiding and abetting a primary violation of § 296.[12] Therefore, Defendants'

---

[12] In their Reply, Defendants argue for the first time that Plaintiff has failed to show sufficient discriminatory intent to establish liability under § 296. (*See* Defs.' Reply 1.) "[A] district court is free to disregard argument raised for the first time in reply papers, especially on a

Motion for Summary Judgment as to Plaintiff's NYSHRL claim against Antonatos under
§ 296(6) is denied.

<u>2.  Plaintiff's Claim Under NYSHRL §§ 296(1) Against Defendant Stein</u>

Defendants challenge Plaintiff's NYSHRL claim against Stein on the basis that it is time-
barred.  NYSHRL claims are governed by a three-year statute of limitations.  *See Kassner v. 2nd
Ave. Delicatessen Inc.*, 496 F.3d 229, 238 (2d Cir. 2007) ("[C]laims under the NYSHRL . . . are
time-barred unless filed within three years of the alleged discriminatory acts.").  However, "the
three-year statute of limitations applicable to claims under the NYSHRL . . . is tolled during the
period in which a complaint is filed . . . with the EEOC."  *Taylor v. City of New York*, 207 F.
Supp. 3d 293, 302 (S.D.N.Y. 2016) (second alteration in original) (internal quotation marks
omitted); *see also Humphreys v. N.Y.C. Health & Hosps. Corp.*, No. 16-CV-9707, 2018 WL
3849836, at *3 (S.D.N.Y. Aug. 10, 2018) ("Although the Second Circuit has not squarely
addressed the question of whether the filing and pendency of EEOC charges toll the statutes of
limitations for NYSHRL . . . claims, courts in this district routinely conclude that the three-year
statute[] of limitations for such claims are tolled during the period in which a complaint is
pending before the EEOC."); *Allen v. N.Y.C. Dep't of Envtl. Prot.*, 51 F. Supp. 3d 504, 511
(S.D.N.Y. 2014) ("[T]he statute of limitations period is tolled during the period in which a

_____

motion for summary judgment."  *Am. Hotel Int'l Grp., Inc. v. OneBeacon Ins. Co.*, 611 F. Supp.
2d 373, 375 (S.D.N.Y. 2009), *aff'd*, 374 F. App'x 71 (2d Cir. 2010).  In any event, the Court
finds Defendants' argument similarly inappropriate for resolution at the summary judgment
stage, as it would require the Court to determine the credibility of witnesses and weigh evidence.
*See Smith*, 798 F. Supp. 2d at 456 (denying summary judgment where defendant, who "ranked
below [other defendants] but above the plaintiffs," stated he saw violation but "did not consider
its racial implications," on the basis that it would require the court to "make determinations of
credibility").

complaint is filed with the EEOC and the issuance by the EEOC of a right-to-sue letter."
(internal quotation marks omitted)); *Morse v. JetBlue Airways Corp.*, 941 F. Supp. 2d 274, 291
(E.D.N.Y. 2013) ("Courts in this Circuit have tolled the statute of limitations applicable to
NYSHRL . . . claims during the pendency of any complaint that is filed with the New York
Division of Human Rights ('NYDHR') or the EEOC."); *Manello v. Nationwide Mut. Ins. Co.*,
No. 11-CV-0243, 2012 WL 3861236, at *11 (E.D.N.Y. Sept. 4, 2012) (noting that "courts in this
Circuit have held that the three (3)-year limitations period for NYSHRL claims is tolled for the
period between the filing of an EEOC charge and the issuance by the EEOC of a right-to-sue
letter" (internal quotation marks omitted)); *Wilson v. N.Y.C. Police Dep't*, No. 09-CV-2632,
2011 WL 1215735, at *4 (S.D.N.Y. Mar. 25, 2011), *adopting R&R*, 2011 WL 1215031
(S.D.N.Y. Feb. 4, 2011) ("Courts in this circuit have held that the statute of limitations
applicable to claims under . . . NYSHRL is tolled during the period in which the complaint is
filed with the EEOC.").

　　　　Nevertheless, Defendants argue that Plaintiff's EEOC claim does not toll the statute of
limitations under the NYSHRL because Stein was not named in Plaintiff's EEOC Charge of
Discrimination.  (*See* Defs.' Mem. 6; EEOC Charge 12.)[13]  Defendants do not cite any case that
supports this proposition.[14]  Where courts have been faced with such a fact pattern, they have

---

[13] For non-paginated exhibits filed on ECF, the Court will cite to the ECF-generated page
number at the top right corner of the relevant page.

[14] Defendants cite *Osorio v. Source Enterprises, Inc.*, No. 05-CV-1002, 2006 WL
2548425 (S.D.N.Y. Sept. 5, 2006) and *Kimball v. Vill.of Painted Post*, No. 12-CV-6275, 2016
WL 4417121 (W.D.N.Y. Aug. 19, 2016) in support of their assertion that Plaintiff's NYSHRL
claim against Stein was not tolled by Plaintiff's EEOC complaint because he was not a named
respondent.  (Defs.' Mem. 6.)  However, neither case supports Defendants' argument.  *Osorio*
stands for the proposition that an EEOC charge does not toll the statute of limitations for state

routinely assessed Title VII claims, in which naming defendants in an EEOC complaint is statutorily required to maintain a lawsuit against that individual or entity, differently than NYSHRL claims. *See, e.g.*, *Harris v. NYU Langone Med. Ctr.*, No. 12-CV-0454, 2013 WL 3487032, at *10–12 (S.D.N.Y. July 9, 2013), *adopted as modified by* 2013 WL 5425336 (S.D.N.Y. Sept. 27, 2013) (finding Title VII claims against defendants not named in EEOC charge barred for failure to exhaust administrative remedies but dismissing NYSHRL claims against the same defendants on the merits); *Goodman v. Port Auth. of N.Y. & N.J.*, 850 F. Supp. 2d 363, 384–87 (S.D.N.Y. 2012) (dismissing Title VII claims because the plaintiff "failed to specifically include" the defendant in the EEOC charge, but dismissing NYSHRL claims against the same defendant on the merits); *Zustovich v. Harvard Maint., Inc.*, No. 08-CV-6856, 2009 WL 735062, at *7–10 (S.D.N.Y. Mar. 20, 2009) (denying motion to dismiss NYSHRL claims on the basis that the plaintiff failed to exhaust remedies by neglecting to name certain defendants in its EEOC complaint, because "NYSHRL . . . do[es] not require exhaustion of administrative remedies," while separately assessing Title VII claims under the "identity of interest" exception

---

law claims arising out of the same events on which the EEOC charge is based; it does not address whether tolling applies when the plaintiff sues a defendant who was not named in the EEOC complaint. 2006 WL 2548425, at *3. *Kimball* observed that one of the defendants was not named in the EEOC Charge of Discrimination, but rather in a letter attached to it; however, the court went on to consider the references to the defendant included in that letter, and ultimately dismissed claims against the defendant on the basis that the EEOC complaint did not toll the three-year statute of limitations, rather than because the defendant was not named in the charge. 2016 WL 4417121, at *8. Although the *Kimball* Court is not alone within the Second Circuit in ruling that an EEOC charge does not toll NYSHRL claims, as discussed above, the Second Circuit has not definitively decided the issue, and the majority of courts that have addressed it, including this one, have held that the statute of limitations is tolled while an EEOC proceeding is pending. *See Allen*, 51 F. Supp. 3d at 511 (finding that "the statute of limitations period is tolled during the period in which a complaint is filed with the EEOC and the issuance by the EEOC of a right-to-sue letter").

to statutory requirement that defendants must have been named in EEOC charge (citation and internal quotation marks omitted)). Defendants' own papers point to the underlying rationale: "liability under Title VII . . . exists only with regard to employers, and Plaintiff's charge attempted to identify her employer," while Plaintiff brings her claims here against her supervisors as well. (Defs.' Mem. 7.) However, as discussed above, NYSHRL liability is not limited solely to employers. *See Chamblee*, 154 F. Supp. 2d at 677 (S.D.N.Y. 2001) ("[E]mployees who are not shown to have any power to do more than carry out personnel decisions made by others, but who actually participate in discriminatory conduct, can still be liable [under] the [NYSHRL]." (citing *Tomka*, 66 F.3d 1295)). Furthermore, although Plaintiff's Charge of Discrimination does not name Stein, her accompanying letter refers to Stein and details her precise allegations against him. (EEOC Charge 4–5.) The Court therefore declines to find that Plaintiff's failure to name Stein in Plaintiff's EEOC complaint prevents this Court from tolling the statute of limitations for Plaintiff's NYSHRL claim against Stein.

Because the statute of limitations for Plaintiff's NYSHRL claims was tolled while her EEOC complaint was pending, and because it is undisputed that the latest date upon which any conduct supporting a claim against Stein under the NYSHRL occurred is December 2, 2011, (Defs.' Mem. 7; Pl.'s Mem. 5), Plaintiff had three years from that date, plus the length of time between when her complaint "[was] filed with the EEOC and the issuance by the EEOC of a right-to-sue letter," *Allen*, 51 F. Supp. 3d at 511, to file her NYSHRL claims against Stein. Plaintiff filed a Charge of Discrimination with the EEOC on October 16, 2014, (*see* EEOC Charge 1), with 47 days remaining within the statute of limitations period, and the EEOC's Right to Sue letter was mailed on March 30, 2016, (*see* Right-To-Sue Letter). This Action was initially

commenced on April 25, 2016. Thus, even assuming Plaintiff's time resumed on March 30, 2016, the day the letter was issued, the Complaint was filed within the remaining 47 days of Plaintiff's limitation period.[15] Accordingly, Defendants' Motion for Summary Judgment on Plaintiff's claim against Stein under § 296(1) of the NYSHRL is denied.

### 3. Plaintiff's Claims For Malicious Prosecution Against Defendants NEDM, Gelbart, Totillo, and Farides

Defendants move for summary judgment on Plaintiff's malicious prosecution claims against NEDM, Gelbart, Totillo, and Farides on the basis that they had probable cause to file criminal charges against Plaintiff, or, in the alternative, that they reasonably relied on the advice of counsel in doing so. (*See* Defs.' Mem. 10–21.) The Court will address each argument separately.

### a. Probable Cause

To succeed on a claim for malicious prosecution, a plaintiff must show "(1) that the defendant commenced or continued a criminal proceeding against [her]; (2) that the proceeding was terminated in the plaintiff's favor; (3) that there was no probable cause for the proceeding; and (4) that the proceeding was instituted with malice." *Ong v. Park Manor (Middletown Park) Rehab. & Healthcare Ctr.*, No. 12-CV-974, 2017 WL 4326540, at *10 (S.D.N.Y. Sept. 28, 2017) (internal quotation marks omitted). "Probable cause is a complete defense to any action for false

---

[15] This Court assumes that a plaintiff receives a right-to-sue letter within three days after it is mailed, and the running of the statute of limitations recommences on the day the letter is presumed received, rather than the day it was mailed. *See Allen*, 51 F. Supp. 3d at 511 ("Drawing all reasonable inferences in Plaintiff's favor, the Court will assume that Plaintiff received his right-to-sue letter on [three days after it was mailed], at which time the running of the statute of limitations on Plaintiff's NYHRL claims resumed."). However, in either case, Plaintiff's claim falls within the statute of limitations.

arrest or malicious prosecution in New York." *Dickerson v. Napolitano*, 604 F.3d 732, 751 (2d

Cir. 2010). "In the context of a malicious prosecution claim, probable cause under New York

law is the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in

the belief that he has lawful grounds for prosecuting the defendant in the manner complained of."

*Rounseville v. Zahl*, 13 F.3d 625, 629 (2d Cir. 1994) (internal quotation marks omitted).

"[M]erely furnishing information to law enforcement authorities, who are then free to exercise

their own judgment as to whether criminal charges should be filed, and giving testimony at a

subsequent trial are insufficient to establish liability. However, a civilian complainant can be

held liable for malicious prosecution if she intentionally provided false evidence to the police

resulting in the plaintiff's arrest and prosecution." *Weiner v. McKeefery*, 90 F. Supp. 3d 17, 45–

46 (E.D.N.Y. 2015) (citations and internal quotation marks omitted).

Defendants move for summary judgment on the basis that NEDM, Gelbart, Totillo, and

Farides had probable cause to bring criminal charges against Plaintiff based on adjustments made

to the billing accounts of her family members for services provided by Family Dental. The

Court will address each Defendant in turn.

### i. Totillo and Farides

Defendants argue that Totillo and Farides, relying on their observations of billing records

and information provided by Maddie Eschner and by the dentists who provided services to

Plaintiff's family members, reasonably believed that Plaintiff "was improperly accessing and

mismanaging Family Dental accounts receivable for the benefit of her family members." (Defs.'

Mem. 13–15.) Specifically, Defendants assert that an employee assigned to the Brewster office

front desk, Ana Villavicencio, informed Eschner that Plaintiff had adjusted the patient ledger of

her nephew for services rendered by Dr. Vincent Ayuko, a Family Dental dentist. (*See id.* at 13; Defs.' 56.1 ¶ 65.) Eschner found this "suspicious" because she knew Plaintiff's nephew's insurance had denied coverage and that Dr. Ayuko did not approve the adjustment. (*See* Defs.' 56.1 ¶¶ 66–67; *see also* Decl. of Dr. Vincent Ayuko ("Ayuko Decl.") ¶ 6 (Dkt. No. 90).) Eschner and Villavicencio informed Farides, (*see* Defs.' 56.1 ¶ 75), who emailed Wicke and Totillo informing them of the discrepancy as well as Plaintiff's alleged removal of charges for services provided to her husband by Gelbart on August 20, 2014, (*see* Farides Email). Farides and Totillo then worked over several days "to uncover additional unauthorized account adjustments made by Plaintiff." (Defs.' 56.1 ¶ 76.)

Plaintiff argues that she has raised a triable issue of fact with respect to whether Defendants had probable cause to file criminal charges against Plaintiff because she has demonstrated that the financial records Defendants submitted with their motion showing the billing adjustments were "obviously doctored," (Pl.'s Mem. 10), and that whether the adjustments were authorized "would be Mrs. Nokaj's word against Gelbart's word[—]an issue of credibility" not suitable for resolution at the summary judgment stage, (*id.* at 14–15).

Plaintiff's explanations in her Counterstatement regarding alleged doctoring of the financial records provided to the police are somewhat confusing. For example, regarding an alleged unauthorized adjustment for services provided to her husband on August 20, 2014, Plaintiff cites "inconsistencies" between two audit trail printouts that she asserts "suggest a manipulated or fabricated document." (Pl.'s 56.1 Counter. ¶ 292.) However, the audit trails at issue reflect different time spans, so it is not clear why the absence of activity on certain dates for one form but not the other implies fabrication. (*Compare* Pl.'s Decl. Ex. 14, at N00622–23

(showing adjustment activity on August 20, 2014) *with id.* at N00627 (showing adjustment activity for August 20, 2014 through August 23, 2014).) Other explanations more clearly identify alleged disparities between actual and fabricated charges, but also rely on conclusory assertions that the charges are "ridiculous and made to further inflate the false charges Defendants had lodged against [Plaintiff]." (Nokaj Decl. ¶ 77.) For example, with respect to an adjustment for services provided to Plaintiff's nephew on July 31, 2013, Plaintiff explains that insurance covered a $725 charge for a post and crown, but that additional charges of $167 and $399, for prophylaxis and teeth whitening respectively, were "arbitrarily assigned." (Pl.'s 56.1 Counter. ¶¶ 311–12.) Plaintiff claims that she was given verbal approval to charge $60 for the prophylaxis but that "family Dental Brewster appears to have assigned the arbitrary cost of $167.00," (*id.* ¶ 311), and that "[t]he $399.00 charge for white strips had been fabricated to further inflate the false criminal charges" because white strips are typically given to patients for free after a cleaning, (*id* ¶¶ 313–314). It is not clear from this explanation precisely what makes the charges "arbitrarily assigned," or that the document is "obviously doctored" on its face. Plaintiff's Counterstatement also explains that several of the adjustments were authorized by Gelbart, (*see id.* ¶¶ 285, 304, 318), but does not specifically allege that anyone other than Gelbart would have known these adjustments were authorized, and states that authorized adjustments "are not necessarily reflected" on the patient router, (*id.* ¶ 241), and that at least some employees when reviewing patient records "would not know whether or not a discount or 'no charge' to another employee or employee's family member is authorized," (Pl.'s 56.1 Resp. ¶ 65).

Nevertheless, the Court finds that Plaintiff's other arguments, bolstered by the record, create a material fact dispute sufficient to preclude summary judgment regarding whether Totillo

and Farides understood or believed that information they provided to the police was untrue. Plaintiff argues, and Defendants acknowledge, that it was generally office policy to provide discounted services to employees and their families. (*See* Defs.' Mem. 16 ("[I]t was Dr. Gelbart's practice to give discounts to NEDM employees and family members")".) Plaintiff further observes that the Assistant District Attorney who investigated the charges found it suspicious that the policy would not have been followed for her as it had routinely been for others and determined there was no probable cause to prosecute Plaintiff partially on that basis. (*See* Totillo Dep. 88–89; Gelbart Dep. 122–123, 134–136, 138; Gil Decl. ¶¶ 4–5.) The disparity is particularly notable when combined with the timing of the investigation into the alleged improper adjustments, which occurred while Plaintiff was out sick, (*see* 2d Am. Compl. ¶ 58; Totillo Dep. 233), the timing of the discovery of months-old discrepancies, given that Plaintiff asserts that employees regularly review financial records to ensure there are no billing issues, (*see* Pl.'s 56.1 Resp. ¶ 65), and the timing of the ultimate decision to press charges, just a few days after NEDM employees were questioned by police about Plaintiff's sexual harassment allegations, (*see* Defs.' 56.1 ¶¶ 122, 124, 127, 130). Furthermore, Farides's August 26, 2014 email initially raising the alleged improper adjustments to Wicke and Totillo references a conversation that occurred the day before with Plaintiff and "with [Totillo] as witness," (*see* Farides Email), but Totillo concedes in her deposition that the conversation "may not have taken place," (*see* Totillo Dep. 231–232), creating conflicting testimony even among Defendants as to how the investigation into the alleged adjustments unfolded and raising credibility questions that are inappropriate for resolution on summary judgment.

Although none of these factors definitively prove that Totillo and Farides knew the information given to police officers to prosecute Plaintiff was untrue, taken together they are sufficient to create a dispute of fact on this question that is more appropriately decided by a jury. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (noting that at the summary judgment stage, the court is not to "weigh the evidence and determine the truth of the matter"); *see also Rounseville*, 13 F.3d at 630 (reversing grant of summary judgment on malicious prosecution claim where "[t]he sparse factual record in this case, when viewed most favorably to the [plaintiffs], does not eliminate the possibility that the defendants initiated the criminal proceeding without probable cause"); *Blake v. Race*, 487 F. Supp. 2d 187, 202 (E.D.N.Y. 2007) (noting that the "standard rule is that 'credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'" (quoting *Liberty Lobby*, 477 U.S. at 255)). Defendants' Motion for Summary Judgment on Plaintiff's malicious prosecution claim against Totillo and Farides is therefore denied.

### ii. Gelbart

Defendants argue that Gelbart similarly had probable cause to file criminal charges against Plaintiff for unauthorized adjustments. In particular, Defendants state that Gelbart "reported that he neither approved nor authorized a full write-off of [Plaintiff's] husband's procedures," (Defs.' Mem. 16), and that "Plaintiff does not and cannot claim that [Gelbart] authorized wholesale deletion" of the cost of dental services Gelbart provided to Plaintiff's husband, (Defs.' Reply 7). However, Defendants cite to Plaintiff's 56.1 Response in support of this claim, in which Plaintiff expressly disputes the assertion that she wrote off anything without authorization and cites record evidence in support. (*See* Pl.'s 56.1 Resp. ¶ 79.) Indeed, Plaintiff

27

repeatedly stated in her deposition and declaration that Gelbart authorized all billing adjustments made. (*See* Nokaj Dep. 211–216, 220–222; Nokaj Decl. ¶¶ 70–72.)

As a general rule, "district courts may not weigh evidence or assess the credibility of witnesses at the summary judgment stage." *Jeffreys v. City of New York*, 426 F.3d 549, 551 (2d Cir. 2005); *see also Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." (internal quotation marks omitted)). Where the evidence presents "a question of 'he said, she said'" the court "cannot . . . take a side at the summary judgment stage." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 726 (2d Cir. 2010); *see also Kassel v. City of Middletown*, 272 F. Supp. 3d 516, 535 (S.D.N.Y. 2017) (noting that "it is not the role of the [c]ourt at summary judgment to resolve [a] factual clash"); *Bale v. Nastasi*, 982 F. Supp. 2d 250, 258–59 (S.D.N.Y. 2013) (holding that "[w]here each side . . . tells a story that is at least plausible and would allow a jury to find in its favor, it is for the jury to make the credibility determinations and apportion liability, and not for the court."). Even where "[Plaintiff's] evidence may be thin, [Plaintiff's] own sworn statement is adequate to counter summary judgment." *Scott v. Coughlin*, 344 F.3d 282, 290–91 (2d Cir. 2003) (holding that "[t]he credibility of [Plaintiff's] statements and the weight of contradictory evidence may only be evaluated by a finder of fact").

Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in her favor, the Court finds there is a genuine issue of material fact with respect to Plaintiff's malicious prosecution claim against Gelbart. A reasonable fact finder could credit Plaintiff's version of events that Gelbart did authorize the adjustments made but claimed he did

not and directed that criminal charges be filed against her, knowing that the basis of those charges was false and that he therefore had no probable cause to press charges. Defendants' Motion for Summary Judgment on this claim is therefore denied.

### iii.  NEDM

Under New York law, "an employer is liable for the actions of an employee if h[is] actions were foreseeable and if []he acted within the scope of h[is] employment." *Doe v. Guthrie Clinic, Ltd.*, 710 F.3d 492, 495 (2d Cir. 2013).  "An employee's conduct ordinarily cannot be attributed to the employer, however, if it was motivated solely by personal reasons unrelated to the furtherance of the employer's business." *Id.* (internal quotation marks omitted).  However, an employer may be held responsible where an employee's actions were "at least partially in furtherance of his employer's interests." *Gibbs v. City of New York*, 714 F. Supp. 2d 419, 425 (E.D.N.Y. 2010) (citing Restatement (Second) of Agency § 236 (1958)); *see also Sclafani v. PC Richard & Son*, 668 F. Supp. 2d 423, 447 (E.D.N.Y. 2009) ("For an intentional tort to be considered within the scope of employment, however, it must in some broad sense further the employer's business." (citing *Riviello v. Waldron*, 391 N.E.2d 1278, 1282 (N.Y. 1979))).  To determine whether an employee is acting within the scope of his or her employment, courts consider:

> the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated.

*Bhd. Mut. Ins. Co. v. Ludwigsen*, No. 16-CV-6369, 2018 WL 4211319, at *10 (S.D.N.Y. Sept. 4, 2018) (quoting *Riviello*, 391 N.E.2d at 1281).

Defendants assert that none of the Family Dental dentists is an NEDM employee, and therefore they "cannot act within the scope of NEDM employment." (Defs.' Mem. 17 (emphasis omitted).) Specifically, Defendants claim that "Defendant NEDM does not employ dentists or any licensed healthcare personnel," and that "NEDM is not a parent, subsidiary, or affiliate, directly or indirectly, of Family Dental." (Defs.' 56.1 ¶ 1.) However, Plaintiff disputes this, alleging that "[a]t all relevant times, NEDM owned 80% of Gelbart & Kesselman PC doing business as Family Dental Group and Saw Mill Dental and the remaining 20% of Gelbart & Kesselman PC is owned by Defendant Michael Gelbart, Defendant Lawrence Stein, Dr. Kesselman and Dr. Robert Friedman." (Pl.'s 56.1 Resp. ¶ 1.) Plaintiff cites to NEDM's employee handbook, which describes the company as a "dental practice management group" and states that it acquired Family Dental in 2007, (Pl.'s Decl. Ex. 1 ("NEDM Handbook") 5–6), as well as Gelbart's deposition testimony in which he states that Gelbart & Kesselman PC "was originally owned by North East Dental Management," (Gelbart Dep. 16).

Drawing all inferences in Plaintiff's favor, the Court cannot say that Plaintiff's malicious prosecution claim against NEDM fails as a matter of law. If NEDM is indeed a majority owner of Gelbart & Kesselman PC, a reasonable jury could find that Gelbart is an NEDM employee, and that he was acting within the scope of his employment with NEDM when he sought Plaintiff's prosecution. *See Tomscha v. Poole*, No. 16-CV-1263, 2016 WL 7378974, at *8 (S.D.N.Y. Dec. 20, 2016) (finding employees were acting within the scope of their employment in filing allegedly false and defamatory misconduct report where the employees were "expected to . . . report issues involving misconduct," an obligation they would typically fulfill through "the filing of oral and written statements describing incidents"); *Lowy v. Travelers Prop. & Cas. Co.*,

No. 99-CV-2727, 2000 WL 526702, at *4 (S.D.N.Y. May 2, 2000) (denying summary judgment on hospital's liability for misconduct where an employee disciplined another employee by physically dragging her and handcuffing her to a file cabinet because, although clearly a departure from a doctor's "normal methods" of dealing with employees, the doctor "acted at work and in furtherance of the hospital's interests" and the doctor had allegedly engaged in "humiliating" and "demeaning" behavior toward female co-workers in the past, making it foreseeable that he would "behave in an aggressive, degrading manner toward a female co-worker" again); *Petrousky v. United States*, 728 F. Supp. 890, 898 (N.D.N.Y. 1990) (finding supervisor acted within the scope of her employment in issuing allegedly libelous memoranda about an employee's misconduct where it was foreseeable that "in her supervisory capacity [she] would write memoranda regarding" employee misconduct, and all the memoranda in question "relate[d] to personnel issues" even if also motivated by "personal animus").  Even if the alleged acts of sexual harassment are not within the scope of Gelbart's employment, *see Swarna v. Al-Awadi*, 622 F.3d 123, 144–45 (2d Cir. 2010) ("New York courts consistently have held that sexual misconduct and related tortious behavior arise from personal motives and do not further an employer's business, even when committed within the employment context." (citation and quotation marks omitted)), Gelbart's subsequent failure to address the alleged culture of harassment in his supervisory capacity, his efforts to prosecute Plaintiff for her alleged unauthorized write-offs of charges for services rendered to her family, and his instructions to other employees to press charges on behalf of the company, were "at least partially in furtherance of his employer's interests," *Gibbs*, 714 F. Supp. 2d at 425, and therefore may render NEDM liable.  *See Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 162 (2d Cir. 2014) (declining

31

to "disturb the jury's finding" that employer was liable for an employee's intentional torts where supervisor "refused to use his position . . . to address the ongoing harassment, punish those responsible, and cooperate with investigating authorities," which "fell within [his] assigned role in the company").

Defendants concede that Totillo and Farides are NEDM employees, but argue that they had probable cause to initiate criminal proceedings against Plaintiff as a matter of law. (Defs.' Mem. 18.) The Court has already rejected this argument, and Defendants do not argue that they were acting outside the scope of their employment; on the contrary, Defendants expressly maintain that Totillo and Farides appropriately acted pursuant to their employment responsibilities by reporting and prosecuting Plaintiff's alleged misconduct in the workplace. (*See* Defs.' Mem. 13–17.) Even if Defendants had argued that Totillo and Farides were acting outside the scope of their employment, "the question of whether a particular act was within the scope of employment is dependent on factual considerations and so is ordinarily one for the jury." *Gibbs*, 714 F. Supp. 2d at 422; *see also Sokolow v. Palestine Liberation Org.*, 60 F. Supp. 3d 509, 517 (S.D.N.Y. 2014) ("[B]ecause the determination of whether a particular act is within the scope of the servant's employment is so heavily dependent on factual considerations, the question is ordinarily one for the jury." (citation, alterations, and quotation marks omitted)).

Finally, Plaintiff cites an email purportedly from Gelbart to NEDM's CEO that states, "Got nasty letter from her lawyer. Go after Vilma ASAP." (*See* Pl.'s Decl. Ex. 34 ("Gelbart

Email").)[16]  A reasonable jury could infer from this exchange that NEDM, acting through its CEO and employees, learned of Plaintiff's discrimination lawsuit and sought Plaintiff's prosecution in order to discourage her from pursuing her case.  *See E.E.O.C. v. Die Fliedermaus*, 77 F. Supp. 2d 460, 473 (S.D.N.Y. 1999) ("An employer can also be held liable for an employee's discriminatory act if the employer became a party to it 'by encouraging, condoning, or approving it.'" (quoting *Totem Taxi, Inc. v. N.Y.S. Human Rights Appeal Bd.*, 480 N.E.2d 1075, 1077 (N.Y. 1985))).  Therefore, Defendants' Motion for Summary Judgment on Plaintiff's malicious prosecution claim against NEDM is denied.

### b.  Reliance on Advice of Counsel

Defendants also move for summary judgment on Plaintiff's malicious prosecution claims on the grounds that each Defendant reasonably relied on the advice of counsel in initiating criminal charges against Plaintiff.  (*See* Defs.' Mem. 18–21.)  Plaintiff argues that Defendants waived this argument by failing to raise it as an affirmative defense in Defendants' Answer to the Complaint, and that even if not waived, Defendants have not provided sufficient evidence to allow a jury to find them entitled to the defense.  (*See* Pl.'s Mem. 16–17.)

"In order to establish the affirmative defense of advice of counsel, a defendant must show (1) that he made a complete disclosure to counsel; (2) sought advice from counsel as to the legality of his actions; (3) received advice that his conduct was legal; and (4) relied on such advice in good faith."  *In re Reserve Fund Sec. & Derivative Litig.*, No. 09-CV-4346, 2012 WL 4774834, at *2 (S.D.N.Y. Sept. 12, 2012) (citation and internal quotation marks omitted).

---

[16] Plaintiff submits that this document also states, "go for the throat," but that phrase is not found in the cited exhibit.

Contrary to Plaintiff's contention, (*see* Pl.'s Mem. 16–17), "there is no explicit rule that advice of counsel is an affirmative defense that must be pled in one's answer pursuant to Fed. R. Civ. P. 8(c)," *Bath & Body Works Brand Mgmt., Inc. v. Summit Entm't, LLC*, No. 11-CV-1594, 2013 WL 3479418, at *3 (S.D.N.Y. July 9, 2013). Courts in the Second Circuit have allowed parties to raise advice of counsel to defeat an element of a claim "without having to include it as an affirmative defense in their answers." *Id.* (collecting cases). The Court therefore declines to find the defense automatically waived for failure to include it in Defendants' Answer.

However, the Court finds that there are disputed issues of fact with respect to whether a complete disclosure to counsel was made. As discussed above, there are disputed issues of fact regarding whether Gelbart authorized the adjustments Plaintiff made to the billing accounts of her family members and, by extension, provided false information in support of the criminal charges brought against Plaintiff, (*see* Defs.' Reply 7; Nokaj Dep. 211–216, 220–222; Nokaj Decl. ¶¶ 70–72), and whether Totillo and Farides knew that all adjustments were authorized and that the information they provided to the police was therefore untrue, (*see* Pl.'s 56.1 Counter. ¶¶ 236–320). In addition, when asked about what he consulted Landy about, Gelbart stated that "[w]e discussed the threat that Vilma had made . . . [a]nd I had an order of protection taken out and I put cameras all around my house, and I was informed that her brother-in-law was a bad guy and that we had to be worried about physical violence." (Gelbart Dep. 44.) He did not mention that they discussed the billing adjustments.[17] Because the Court cannot determine at this stage

_____

[17] To the extent Defendants would argue that such discussions were not disclosed during Gelbart's deposition because they are privileged, "[w]hen a party invokes a defense based on the notion that he relied on the advice of counsel, the courts generally treat that stance as a waiver of both the substance of the attorney's opinion . . . and of all communications by the client to the

34

whether Gelbart or other dentists indeed authorized the disputed adjustments, or whether Totillo

and Farides knew the adjustments they reported to the police were in fact authorized, it also

cannot determine whether NEDM's attorney Landy received complete information before

rendering legal advice and thus whether Defendants relied on that advice in good faith.  The

Court therefore denies Defendants' Motion for Summary Judgment based on an advice of

counsel defense.

### D. Plaintiff's Claim for Lost Wages

Finally, Defendants move for summary judgment on Plaintiff's claim for lost wages,

arguing that Plaintiff failed to mitigate her damages by "unreasonably abandoning a job held

immediately after NEDM."  (Defs.' Mem. 21–25.)

"Lost wages," or "back pay," is "a specific remedy for unlawful discrimination under

Title VII, and it is also available under the NYSHRL."  *Munson v. Diamond*, No. 15-CV-425,

2017 WL 4863096, at *7 (S.D.N.Y. June 1, 2017), *adopted by* 2017 WL 4862789 (S.D.N.Y. Oct.

26, 2017); *see also Manswell v. Heavenly Miracle Acad. Servs., Inc.*, No. 14-CV-7114, 2017 WL

9487194, at *15 (E.D.N.Y. Aug. 23, 2017) ("A plaintiff prevailing under Title VII [and] the

NYSHRL . . . is generally entitled to an award of back pay."), *adopted by* 2017 WL 4075180

(E.D.N.Y. Sept. 14, 2017).  Under both Title VII and the NYSHRL, "[v]ictims of employment

discrimination are required to mitigate their damages."  *Greenway v. Buffalo Hilton Hotel*, 143

F.3d 47, 53 (2d Cir. 1998); *see also Lightfoot v. Union Carbide Corp.*, 110 F.3d 898, 908 (2d

Cir. 1997) ("The [NYSHRL] substantially tracks Title VII, both in its requirement that plaintiffs

---

attorney pertaining to the matters that are addressed by the attorney's stated opinion."  *In re
Omnicom Grp., Inc. Sec. Litig.*, 233 F.R.D. 400, 413–14 (S.D.N.Y. 2006).

mitigate their damages by seeking and accepting alternative employment and in the legislative

purpose behind the law." (internal citations omitted)).  "A discharged employee must use

reasonable diligence in finding other suitable employment, which need not be comparable to

their previous positions." *Greenway*, 143 F.3d at 53 (internal quotation marks omitted); *see also*

*Jernigan v. Dalton Mgmt. Co., LLC*, 819 F. Supp. 2d 282, 291 (S.D.N.Y. 2011) ("It is settled law

that a victim of employment discrimination is required to mitigate his lost wages by using

reasonable diligence in finding other suitable employment." (alteration and internal quotation

marks omitted)).  "Typically, the employer has the burden to demonstrate that suitable work

existed in the marketplace and that its former employee made no reasonable effort to find it."

*Greenway*, 143 F.3d at 53; *see also Shannon v. Fireman's Fund Ins. Co.*, 136 F. Supp. 2d 225,

228 (S.D.N.Y. 2001) ("It is the defendant's burden to prove that plaintiff failed to satisfy his duty

to mitigate.").  "The question whether an employee has made reasonably diligent efforts is one of

fact for the jury." *Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 696 (2d Cir. 1998).

"[I]n order to fulfill the duty to mitigate, a plaintiff must maintain a suitable job once one

has been located." *Rivera v. Baccarat, Inc.*, 34 F. Supp. 2d 870, 874 (S.D.N.Y. 1999).

However, "a claimant who voluntarily resigned from comparable employment for personal

reasons would not have adequately mitigated damages, but a voluntary quit does not toll the back

pay period when it is motivated by unreasonable working conditions or an earnest search for

better employment." *Hawkins*, 163 F.3d at 696 (internal quotation marks omitted).

Defendants argue that Plaintiff is not entitled to lost wages because she voluntarily

resigned from suitable alternative employment that she obtained immediately after her

termination from NEDM.  (*See* Defs.' Mem. 22–23.)  Plaintiff asserts that the position did not

constitute suitable employment because it required her to spend two and a half hours each day commuting, which interfered with her childcare obligations. (*See* Pl.'s Mem. 24; Pl.'s Counter. ¶¶ 324–325; Nokaj Decl. ¶¶ 80–82.) She further states that while she believed she would be able to find more suitable employment with reasonable efforts, those efforts proved futile after she was arrested. (*See* Pl.'s Mem. 24–25; Pl.'s Counter. ¶¶ 326–328.) Plaintiff has retained an expert witness to testify regarding the impact of criminal charges on pursuit of employment in support of her argument that Defendants' initiation of criminal charges was the cause of her inability to obtain employment after leaving Interstate. (*See* Pl.'s Decl. Ex. 40 ("Anderson Report") 7.)

Drawing all inferences in favor of Plaintiff, the Court finds that there remain disputed issues of material fact that preclude summary judgment on Plaintiff's claims for lost wages. A reasonable jury could find that Plaintiff's alternative employment with Interstate was not suitable due to the length of her commute, and that she made reasonably diligent efforts under the circumstances to find suitable employment closer to home. *See Habe v. 333 Bayville Ave. Rest. Corp.*, No. 09-CV-1071, 2012 WL 113501, at *4 (E.D.N.Y. Jan. 13, 2012) (finding a defendant did not meet its burden of establishing failure to mitigate as a matter of law where the plaintiff failed to document her efforts for several months but "testified at her deposition that she actually applied for some . . . positions"); *Longo v. Breda Transp., Inc.*, No. 04-CV-10241, 2008 WL 852052, at *4 (S.D.N.Y. Mar. 31, 2008) (finding the issue of whether plaintiff had made reasonable efforts to mitigate damages "was a question for the jury" where the plaintiff "testified about his efforts to seek new employment, and that his search was fruitless"); *Mann v. Mass. Correa Elec., J.V.*, No. 00-CV-3559, 2002 WL 88915, at *9 (S.D.N.Y. Jan. 23, 2002) (finding

fact questions remained with respect to the plaintiff's effort to seek comparable employment where the plaintiff "held a temporary position . . . and was interviewed for other positions" and "rejected [a position] . . . on the ground that her daily commute . . . would be too burdensome").

Defendants' Motion for Summary Judgment on Plaintiff's claims for lost wages is therefore denied.

### III. Conclusion

For the foregoing reasons, Defendants' Motion for Partial Summary Judgment is denied. The Court will hold a conference on April 9, 2019 at 2:00 p.m. to discuss the status of the case. The Clerk of Court is respectfully directed to terminate the pending Motion. (Dkt. No. 82.)

SO ORDERED.

DATED:     February 14, 2019
           White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE

38